In re Wesley B. GRIMES and Dolores A. Grimes, Debtors.

Bankruptcy No. 88–10053.

United States Bankruptcy Court, D. South Dakota.

March 29, 1990.

William L. Needler, William L. Needler & Associates, Ltd., Ogallala, Neb., Dana J. Frohling, Aberdeen, S.D., pro se.

Jarvis W. Brown, appraiser, Faulkton, S.D., pro se.

Robert Ronayne, Aberdeen, S.D., for Farm Credit Bank of Omaha.

Kay Cee Hodson, U.S. Trustee Office, Sioux Falls, S.D.

Dale A. Wein, McNeary, Moen & Wein, Aberdeen, S.D., for debtors.

National Farm Management, Ltd., Waubay, S.D., pro se.

Kelly Papousek, Groton, S.D., pro se.

IRVIN N. HOYT, Chief Judge.

The Court has before it the fee applications of William L. Needler & Associates and National Farm Management Ltd., filed by the respective parties in the above referenced case. Objections to the same have been received from newly-retained counsel for the debtors and the United States Trustee. The U.S. Trustee has also moved for an order under 11 U.S.C. § 329 to disgorge improvidently paid fees. After reviewing the facts, the Court's file, briefs, and the arguments of counsel, the Court is prepared to render its decision.

Debtors Wesley and Dolores Grimes filed a Chapter 11 petition for reorganization on March 15, 1988. William L. Needler & Associates of Chicago, Illinois was retained as counsel for the debtors with Dana Frohling serving as local counsel. An application to employ Needler's firm and Frohling was filed with the Court, although no disclosure of compensation was included. The Court approved the employment of the attorneys on April 7, 1988, but advised Attorney Needler by letter that same date that his rate of compensation could be adjusted in the event local counsel was available. The Court's letter to Attorney Needler also addressed the application for employment of National Farm Management, Ltd. The Court returned the application to employ NFM and informed Attorney Needler that NFM's application was insufficiently detailed. Attorney Needler was instructed to correct the deficiencies and resubmit the application if NFM's employment was to be approved. By copy of the letter, NFM was advised of the deficiencies in the application and that their employment had not been authorized.

On July 11, 1988, four months after the filing of the Grimes' petition, three months after the Court rejected its first application, and two months after the filing of Grimes plan and disclosure statement, the Court received an application to employ NFM as a consultant and to assist Attorney Needler "in the preparation of the Plan and Disclosure as to the cash flow and to determine the feasibility of the Plan." An affidavit from Charles J. Bellman, an employee of NFM, was received that same date. The affidavit set forth Bellman's qualifications to serve as a farm consultant. NFM's application was never approved by the Court.

Grimes listed three secured creditors and one unsecured creditor in their schedules. Their disclosure statement was approved on September 8, 1988. Their plan of reorganization was confirmed on December 13, 1988. The secured creditors' objections were settled without the necessity of protracted litigation.

After confirmation, Attorney Needler filed an interim fee application, which was denied. He thereafter filed a final fee application on August 1, 1989. NFM filed an application for fees on August 7, 1989. Objections to these applications were received from the United States Trustee and the debtors. The trustee also filed a motion to disgorge under 11 U.S.C. § 329(b). Farm Credit Bank of Omaha joined in the objections and the motion to disgorge. A lengthy hearing on the fee applications was held on September 26, 1989. The Court took the matter under advisement and received briefs on the issues argued.

After reviewing the applicable law, the Court will examine the fee application submitted by Attorney Needler. It will then

turn its attention to the application of NFM and to the payment of Kelly Papousek, debtors' bookkeeper, and appraiser Jarvis Brown. This memorandum constitutes the Court's findings of fact and conclusions of law in conformance with Bankruptcy Rule 7052 and 9014 and Federal Rule of Civil Procedure 52. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

The employment of professionals is governed by 11 U.S.C. § 327 and B.R. 2014(a). Section 327 provides for the employment of professional persons, including attorneys, accountants, appraisers, auctioneers, or others who are disinterested persons and do not hold or represent an interest adverse to the estate. Bankruptcy Rule 2014(a) provides that an order approving employment of professionals must be made, stating the specific facts showing the necessity for such employment, the name of the person to be employed, the reasons for the selection, the professional service to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the proposed professional's connections with the debtor, creditors or any other party in interest, their respective attorneys and accountants. The application to employ must be accompanied by a verified statement of the person to be employed setting forth that person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants.

Nunc pro tunc or retroactive applications for employment of professionals are generally frowned upon and are granted only under extraordinary circumstances. *F/S Airlease II, Inc. v. Simon*, 844 F.2d 99 (3d Cir.1988), *Okamota v. THC Financial Corp.*, 837 F.2d 389 (9th Cir.1988), *In re Arkansas Co., Inc.*, 798 F.2d 645 (3d Cir. 1986). In the Eighth Circuit, a bankruptcy court may, for equitable reasons and in its discretion, enter a nunc pro tunc order authorizing employment. *See Lavender v. Wood Law Firm*, 785 F.2d 247 (8th Cir. 1986).

Compensation of professionals is primarily governed by § 330(a) of the Code, which states:

After notice ... the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

Under B.R. 2016(a), an entity seeking compensation for services or reimbursement for expenses must file with the Court an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amount requested.

The burden of proof in a request for the approval of professional fees and expenses is always upon applicant. *In re Yankton College*, 101 B.R. 151 (Bankr.D.S. D.1989) (citing *In re Lindberg Products, Inc.*, 50 B.R. 220 (Bankr.N.D.Ill.1985), *In re Harman Supermarket, Inc.*, 44 B.R. 918 (Bankr.W.D.Va.1984), *In re Horn & Hardart Baking Co.*, 30 B.R. 938 (Bankr.E.D. Pa.1983), and *In re Pettibone Corp.*, 74 B.R. 293 (Bankr.N.D.Ill.1987)).

In evaluating an application for the approval of compensation and expenses, the Court must refer to the lodestar approach and the twelve factors recognized in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). *See also Yankton College, supra*. The factors to be considered are:

1. the time and labor required
2. the novelty and difficulty of the questions
3. the skill required to perform legal services properly

4. the preclusion of employment due to acceptance of the case

5. the customary fee

6. whether the fee is fixed or contingent

7. time limitations imposed by the client or the circumstances

8. the amount involved and the results obtained

9. the experience, reputation and ability of the attorneys

10. the undesirability of the case

11. the nature and length of the professional relationship with the client

12. awards in similar cases

This Court's opinion in *In re Hanson*, No. 386–00136, Slip Op., 1989 WL 78596 (Bankr.D.S.D. March 8, 1989) is also instructive. The following standards were set forth in *Hanson:*

> [E]very application for attorney fees must include a specific analysis of each task for which compensation is sought. The application should list and describe the activity, the date it was performed, the attorney or other professional who performed the work, the time spent on the work and the individual's hourly rate.... [S]everal activities should not be lumped into a single entry. Rather, counsel must list each type of service with the corresponding specific time allotment.

▆▆▆ *Hanson* also addressed professional fees and reimbursement for expenses relating to travel time. Under *Hanson,* travel time is compensable at the professional's full hourly rate, but the professional must (1) sufficiently itemize the necessity of the travel, (2) separate travel time from other services performed the same day, (3) specify the mode of travel and (4) state the beginning and ending points of travel. Travel time should be prorated with other cases if out of town appearances coincide, and compensation for travel may be denied as unnecessary if an attorney located far from the situs of the bankruptcy is employed when adequate local representation is available. *Hanson,*

*supra. See also In re Henning*, 52 B.R. 350 (Bankr.D.S.D.1985). (*Henning I*)

▆▆▆ Payments made to professionals may be disgorged under § 329(b) if the compensation paid exceeds the value of the services rendered. Section 329(b) and corresponding Bankruptcy Rules 2016 and 2017 apply to all persons who render legal services to the debtor. *In re Glad*, 98 B.R. 976 (9th Cir. BAP 1989). Such services would include soliciting financial information and assisting with the preparation of schedules. *Id.* at 978.

▆▆▆ The Court will now examine Attorney Needler's fee request in light of the twelve *Johnson* factors.

1. Time and labor required. The fact that this bankruptcy was less than complicated was admitted by Attorney Needler at the hearing and is clear from the Court's review of the file.

2. Novelty and difficulty of the questions. No novel or difficult questions arose during the pendency of this bankruptcy. Mr. Needler conceded in his brief that there were no such questions presented. He noted, however, that many questions, such as the effect of a § 1111(b) election or the absolute priority rule, can arise in such cases. The Court notes, however, that these are possible concerns in every case filed under Chapter 11.

3. Skill required to perform legal services properly. The Court does not doubt that Attorney Needler possessed the skills sufficient to see this bankruptcy through confirmation. However, as previously noted, this was not a case in which an inordinate amount of bankruptcy expertise was necessary in order to achieve the result obtained by Mr. Needler.

4. Preclusion of other employment due to acceptance of the case. Mr. Needler submitted no evidence that he declined other employment due to the acceptance of the Grimes' bankruptcy.

5. The customary fee. Attorney Needler asked Grimes for a retainer of $7,500.00 to be billed against his hourly rate of $175.00. His fee application set his associates' hourly rates as follows:

James Truax: $100.00 ($125.00 after 8–1–88)

Frank Stepnowski: $100.00 ($125.00 after 8–1–88)

Gregory Palis: $75.00

Michael Carpenter: $75.00

Aberdeen Bankruptcy Attorney Curt Ewinger testified that his current hourly rate is $75.00 per hour and that 75% of his cases were bankruptcy matters. He has six years of legal experience. To Mr. Ewinger's knowledge, the highest hourly rate currently charged by a bankruptcy practitioner in this District is $100.00 per hour.

6. Whether the fee is fixed or contingent. It is admitted and undisputed that Attorney Needler took this case on a fixed fee.

7. Time limitations imposed by the client or the circumstances. Mr. Needler noted that self-imposed time limitations were necessary because of increasing land values. The Court notes that this case was on a "fast track" that led to confirmation approximately eight months after the petition was initially filed. However, the Court also notes that no actions that could have delayed or complicated confirmation, such as motions for relief from the automatic stay, for adequate protection, or any adversary proceedings, were ever filed.

8. The amount involved and the results obtained. This case involved only three secured creditors and amounted to a write down of the debt owed to the Farmers Home Administration. While satisfactory results were obtained by Attorney Needler, it must be remembered that the case was not extraordinarily large or unduly complicated.

9. The experience, reputation and ability of the attorney. The Court recognizes that Mr. Needler is experienced, reputable, and an able attorney. Attorney Needler testified at the hearing that he limited his practice to reorganizations under Chapter 11 of the Bankruptcy Code. This Court notes, however, that the rates charged by Mr. Needler for this rather garden variety bankruptcy may not be justified.

10. The undesirability of the case. Mr. Needler testified that the undesirable aspects of this case were mainly its geographic location and its timing. However, Mr. Needler was fully aware of these aspects prior to accepting the case.

11. The nature and length of the professional relationship with the client. No evidence was presented that there were any problems in the relationship between Grimes and Mr. Needler or his associates. The Court notes, however, that the parties met infrequently during the pendency of this case.

12. Awards in similar cases. The Court notes from the transcript of the hearing that no evidence was received to substantiate similar fees in cases similar to the one under consideration. The only testimony on the subject appears to be that of Attorney Ewinger, who testified as to his hourly rate and noted that his review of the Grimes' matter led him to conclude that the case was not unusual, except that Grimes' had filed a motion to borrow under § 364, which motion was eventually granted.

A review of Attorney Needler's fee application, when examined in light of the above factors, leads this Court to conclude that this case was not so large or complex to justify the atypical rates charged by Attorney Needler and his associates. As a result, the hourly rates for these professionals will be set as follows:

Needler—$100.00 per hour

Truax—$75.00 per hour

Stepnowski—$75.00 per hour

Palis—$65.00 per hour

Carpenter—$65.00 per hour

The Court has examined the time sheets furnished by Attorney Needler. Some of the charges are for non-professional services or involve contact with parties such as Kelly Papousek or NFM. The Court, for reasons to be explained below, does not believe the contact with these parties was necessary. The Court finds reasonable the following charges:

## Attorney Needler—1988:

| Date | Time Requested | Time Allowed | Comment |
|---|---|---|---|
| February | .5 | 0 | Deduct conferences with Charles Bellman of NFM on 2–7 & 2–8 |
| March | 3.3 | 2.95 | Deduct for call to Papousek & on 3–15 & conference with paralegal on 3–16 |
| April | 1.1 | 1.1 | |
| May | 2.85 | .7 | Deduct review of file, call re: continuance, correspondence, calls to Papousek & memo to Truax (dates obliterated) |
| June | 7.9 | 7.0 | Deduct contact with Papousek on 6–28, accountant on 6–30, NFM on 6–13 and appraiser on 6–28 |
| July | .35 | 0 | Insufficient explanation of activities on 7–17 |
| August | 1.65 | .5 | Deduct call to NFM on 8–5, call & conference with Truax and paralegal on 8–11, contact with Papousek on 8–27 |
| September | .5 | .25 | Deduct call to unknown accountant on 9–12 |
| October | .35 | .35 | |
| November | .3 | .1 | Deduct contact with Papousek & NFM on 11–26 and 11–27 |
| 10-1-88 to 7-25-89 | 2.7 | 2.25 | Deduct call to Papousek on 2–25, memo to Jean on 3–31 and review of file on 7–19 |
| Total = $1,520.00 | | 15.20 | hours at $100.00 per hour |

## Attorney Truax—1988:

| Date | Time Requested | Time Allowed | Comment |
|---|---|---|---|
| May | 7.8 | 4.4 | Deduct call to Needler on 5–11, preparation of form notices on 5–13 & 5–26, calls to clerk's office on 5–13, 5–26, 5–27 & 5–31 (non-professional services), and call to Papousek on 5–16 |
| June | 9.4 | 5.6 | Deduct for service of disclosure statement on 6–13, calls to attorneys and clerk re: continuance on 6–13, preparation of motion to continue on 6–10, conference call with Needler on 6–17, and conference with appraiser on 6–23 |
| July | 1.5 | 1.5 | |
| August | 1.0 | 1.0 | |
| September | 0 | 0 | |
| October | 2.3 | 1.9 | Deduct call to Ronayne and clerk re: continuance on 10–14 |
| November & December | 14.2 | 12.1 | Deduct proofreading on 11–30, calls to Papousek on 12–6 & 12–14, and review of case on 12–14 |
| Total = $1,987.50 | | 26.5 | hours at $75.00 per hour |

## Attorney Stepnowski—1988:

| Date | Time Requested | Time Allowed | Comment |
|---|---|---|---|
| July | .1 | 0 | Deduct call to NFM on 7–19 |
| September | .4 | .4 | |
| December | .4 | .4 | |
| Total = $60.00 | | .8 | hours at $75.00 per hour |

Attorney Carpenter—1988:

| Date | Time Requested | Time Allowed | Comment |
|---|---|---|---|
| August | 1.7 | .25 | Reduced to .25 hours for drafting ballot on 8–30 |
| September | .6 | 0 | Deduct non-professional services on 9–1, 9–7 & 9–13 |
| Total | | .25 | hours at $65.00 per hour |
| = | $16.25 | | |

Attorney Palis—1988:

| Date | Time Requested | Time Allowed | Comment |
|---|---|---|---|
| May | .4 | 0 | Deduct non-professional services on 5–25 |
| August | .1 | 0 | Deduct letter to "consultants" on 8–2 |

Attorney Needler has also requested certain compensation for paralegal services at a rate of $50.00 per hour for "paralegal A" and $28.50 per hour for "paralegal B." If paralegal work is to be compensated, the qualifications of the paralegal should be established to justify the charge. *See Hanson* and *Yankton College, supra.* No evidence of the qualifications of Needler's paralegals was submitted to the Court, and the Court therefore denies any compensation for paralegal services.

TOTAL PROFESSIONAL FEES ALLOWED—$3,583.75

The Court will next turn its attention to the expenses charged to the Grimes'

in this case. As a general matter, the Court is most concerned with the expenses attendant to travel and unsubstantiated or unexplained Federal Express charges. Needler testified that he used express mail instead of regular mail services in order to meet self-imposed deadlines. The Court does not believe that such reason is sufficient to justify the charges for Federal Express, and those charges will be subtracted. Aside from the travel expenses, which will be treated below, the Court awards the following expenses:

| Statement Date | Expenses Requested | Expenses Allowed | Comment |
|---|---|---|---|
| 3–31–88 | $ 16.09 | $ 5.09 | Deduct Federal Express on 3–14 |
| 4–30–88 | 45.85 | 37.35 | Deduct UPS Air on 3–17 |
| 5–31–88 | 73.30 | 51.30 | Deduct Federal Express on 5–2 |
| 6–30–88 | 164.40 | 117.40 | Deduct Federal Express on 5–14 & 5–26 |
| 7–88 | 11.00 | 0 | Deduct Federal Express on 6–11 |
| 8–88 | 77.00 | 0 | Deduct Federal Express on 6–21, 6–23, and other obliterated dates |
| 9–30–88 | 95.25 | 84.25 | Deduct Federal Express on 8–29 |
| 10–88 | 0 | 0 | |
| 11–30–88 | 48.12 | 48.12 | |
| Through July 1989 | 172.57 | 115.42 | Deduct for double billed travel expenses |
| Total | | $458.93 | |

Travel time was not considered in the previous section of this opinion dealing with professional fees or expenses. The reason for this is because of the Court's concern in balancing the debtors' right to be represented by an attorney of their choice, including out of state counsel, against the relative simplicity of this bank-

ruptcy and the preservation of the bankruptcy estate. As has been previously noted, the Grimes' bankruptcy was not a complicated case that should have warranted the employment of counsel from Chicago, Illinois. While 1988 was a busy year for the bankruptcy lawyers in this District, the Court believes that local counsel could have handled this case. However, from another perspective, debtors should be accorded some latitude in employing counsel and counsel should be reimbursed for expenses attendant with travel. Per this Court's decision in *Hanson, supra,* travel time may be billed at the professional's full rate.

■ The Court is aware that the majority of the travel costs incurred in this case could have been avoided had local counsel been retained. However, the geographical location of bankruptcy counsel in this District sometimes forces even local counsel to incur significant costs to represent their clients. The Court believes that totally denying Attorney Needler's expenses and fees for travel in this case would have a chilling effect on the willingness of counsel to accept cases where the debtor or court site is located at a point other than where the attorney resides. Thus, Attorney Needler's fees and expenses will not be denied. However, taking into consideration that competent counsel was available within a reasonable distance from the court site, the Court's previous admonition to Attorney Needler concerning the potential of the Court reducing his fee if competent local counsel was available, the simplicity of this case and the Court's desire to preserve the bankruptcy estate, Attorney Needler's fees will be reduced to 25% of the amount that the Court finds otherwise allowable. Thus, fees and costs for travel will be allowed as follows:

Attorney Needler—1988:

| Date | Time Requested | Time Allowed | Comment |
|---|---|---|---|
| March | 3.6 | 3.6 | Travel from Chicago to Waubay to Chicago |
| June | 12.95 | 12.95 | Travel from Chicago to Aberdeen to Chicago |
| Total | | 16.55 | hours at $100.00 per hour |
| = | $1,655.00 | | |
| Reduced to 25% = $413.75 | | | |

Attorney Truax—1988:

| Date | Time Requested | Time Allowed | Comment |
|---|---|---|---|
| May | 5.0 | 5.0 | Travel from Chicago to Minneapolis to Chicago |
| November | 8.0 | 8.0 | Travel from Chicago to Aberdeen to Chicago |
| Total | | 13.0 | hours at $75.00 per hour |
| = | $975.00 | | |
| Reduced to 25% = $243.75 | | | |

TRAVEL EXPENSES:

| Date | Expenses Requested | Expenses Allowed | Comment |
|---|---|---|---|
| 3-31-88 | $ 5.09 | 0 | $5.09 billed as "one-third air fare" for 3–16. Attorney Needler could not explain how he arrived at this amount, although it is clear that he came to see the Grimes on this date. The Court cannot allow this expense because of the obviously erroneous amount |
| 5-31-88 | 12.00 | 12.00 | The application and attachments for expenses by Attorney Needler make mention only of Attorney Truax's parking expense on 5–16 for his trip to Minneapolis |
| 6-30-88 | 103.00 | 103.00 | Needler motel, parking, meals, and travel from Sioux Falls to Aberdeen to Sioux Falls on 6–28 |
| 6-30-88 | 475.99 | 475.99 | Needler airfare for trip to Aberdeen on 6–28 |
| 11-30-88 | 57.15 | 57.15 | Truax parking and motel on 11–14 & 11–15 |

TRAVEL EXPENSES:

| Date | Expenses Requested | Expenses Allowed | Comment |
|------|--------------------|------------------|---------|
| 11–30–88 | 512.00 | 512.00 | Truax airfare for trip to Aberdeen on 11–14 |
| Total | | $1,160.14 | |

Reduced to 25% = $290.03

TOTAL TRAVEL TIME AND EXPENSES:
$947.53

As a result of these determinations, Attorney Needler's award totals:

| | |
|---|---|
| Professional fees | $3,583.75 |
| Expenses | 458.93 |
| Travel time & expenses | 947.53 |
| Total | $4,990.21 |

---

Testimony and evidence presented at the hearing indicate that Attorney Needler received $7,430.00 in payments from the Grimes. Attorney Needler's fee application, filed February 13, 1989 acknowledged receipt of $6,010.00 as a retainer from the Grimes. See also Exhibits 6 and 11. Exhibit 21 evidences the payment of an additional $1,420.00 to Attorney Needler on March 3, 1989. The check was written by Mary Ann Grimes with funds provided by the debtors. See Exhibit 20. It thus appears that Attorney Needler has received payments totalling $7,430.00.

Section 329(b) of the Bankruptcy Code provides for the disgorgement of fees paid in excess of the reasonable value of the services rendered by the professional. The Court above has fixed the reasonable value of Attorney Needler's services at $4,990.21. Pursuant to § 329, Attorney Needler therefore will be required to disgorge the balance of the retainer paid to him, a total of $2,439.79.

■ The Court will next review the application of National Farm Management Ltd. NFM claims that it was retained by the Grimes to perform non-legal services. However, their brief in this matter admits that NFM "draft[ed] documents per the instructions and supervision by the Debtors' counsel." Charles and Lois Bellman of NFM both appeared at the hearing. Charles Bellman testified that he had worked on numerous plans and disclosures, providing him with the expertise to review farm operations and prepare documents,

such as the Grimes' plan and disclosure statement, in minimal time. Mr. Bellman testified that the Grimes' plan and disclosure statement were drafted in about ten hours.

While the services performed by NFM were provided from a period pre-petition through confirmation, NFM was *never* issued an order approving its employment, even after NFM had been informed that its application for employment had been returned because of the sparsity of information it contained. Despite the fact that the services allegedly performed by NFM related to drafting the plan and disclosure statement, NFM failed to seek authorization until two months *after* the plan and disclosure statement were filed.

■ A fee application for non-legal professionals, such as farm consultants, is reviewed under the same standards as those applied to attorneys. *In re Stevens*, 109 B.R. 853, 19 B.C.D. 1992 (Bankr.N.D.Ill. 1990) (citing *In re American International Airways, Inc.*, 69 B.R. 396 (Bankr.E.D. Pa.1987), *In re R & B Institutional Sales, Inc.*, 65 B.R. 876 (Bankr.W.D.Pa.1986), *In re Affinito & Son, Inc.*, 63 B.R. 495 (Bankr.W.D.Pa.1986), *In re Cumberland Bolt & Screw, Inc.*, 44 B.R. 915 (Bankr.M. D.Tn.1984) and *In re D.H. Overmyer Co.*, 3 B.R. 678 (Bankr.S.D.N.Y.1980)). While a review of NFM's fee application shows that it is fatally flawed because of its lack of specificity for services rendered and expenses incurred, the Court finds that exacting scrutiny of the application is unwarranted. Rather, the Court will focus on the

impact of NFM's failure to receive Court approval for employment.

As stated above, nunc pro tunc approval of an application for employment of a professional is generally granted only under extraordinary circumstances or when required as a matter of fundamental fairness. *See F/S Airlease, Arkansas* and *Lavender, supra.* *F/S Airlease* set forth four factors to determine whether a nunc pro tunc order should be issued: (1) who was responsible for applying for approval, (2) whether any time pressures existed that necessitated the performance of services prior to employment, (3) the extent to which compensation to the applicant will prejudice innocent third parties, and (4) the length of delay between rendering the services and seeking approval. The Court in *F/S Airlease* goes on to state that the requirement of receiving approval prior to the performance of services is "too strong to be overcome by a mere showing of oversight." *Id.* at 106 (quoting *Arkansas, supra* at 751).

Here, NFM, with its claimed involvement in numerous bankruptcy cases, cannot escape responsibility for insuring that its application for employment was approved prior to rendering services. As the Court noted in *F/S Airlease*, it is only in rare situations that a professional involved in bankruptcies is totally oblivious to the application requirement contained in the Bankruptcy Code. The Court does not believe that this case is one of those rare situations.

As to the second and third factors, there was no time pressure in this case to warrant such a tardy application. The primary professional in this case, Attorney Needler, and his co-counsel, Attorney Frohling, both were able to comply with the application requirement. There was sufficient time for NFM to receive approval from this Court before rendering services. Their failure to receive such approval, or at least to inquire about the status of their application, cannot be condoned. Moreover, the fact that NFM's services may have benefitted the estate or that withholding approval will cause financial hardship is immaterial.

*F/S Airlease, supra* at 108, *Arkansas, supra* at 649.

Finally, the length of delay between the time services were initially rendered and NFM applied for employment is totally inconsistent with the spirit and letter of the Bankruptcy Code. The Code contemplates that professionals must (1) receive approval for employment prior to rendering any services, and (2) receive approval of compensation after such services are performed. See §§ 327 and 330. The process urged by NFM would essentially reduce the two-step procedure contemplated by the Code to a one-step review of whether the professional should have been employed, and if so, what that professional's compensation should be. The Court obviously must decline to follow such a process. The Court concludes that NFM's final application for fees must be denied because of their failure to comply with the provisions of §§ 327 and 330 and the corresponding Bankruptcy Rules.

Further, under the totality of the circumstances in this case, the Court does not believe that it is fundamentally unfair to deny NFM's application. It is apparent that NFM knew or should have known that it needed prior approval before performing services in a bankruptcy case. Their tardy application boasts of their involvement in literally hundreds of bankruptcies. If true, NFM should be well aware of the application process for professionals. Moreover, the necessity of receiving prior approval was reinforced by the Court's letter returning their application for employment.

Regardless of the fact that its employment had never been approved, testimony and evidence presented at the hearing revealed that NFM had received at least $5,811.87 from the Grimes. See Exhibits 2, 5, 14, 19 and 22. The next question to be determined is whether the $5,811.87 paid to NFM by the debtors should be disgorged under § 329(b).

The Court's supervisory power over fees charged for services rendered or to be rendered in contemplation of or in connection with a bankruptcy case extends to lay persons as well as lawyers. *Glad, supra.* *See also In re Fleet*, 95 B.R. 319

(E.D.Pa.1989), *In re Anderson*, 79 B.R. 482 (Bankr.S.D.Ca.1987), and *In re Telford*, 36 B.R. 92 (9th Cir. BAP 1984). Section 329 was enacted as a result of congressional concern about the "serious potential for overreaching by the debtor's attorney." H.R.Rep. No. 595, 95th Cong., 1st Sess., 329 (1977); S.Rep. No. 989, 95th Cong., 2d Sess., 39–40 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5825, 6285.

As noted by the Court in *Fleet*, the potential for such overreaching "is equally present where a lay person provides services in connection with or in contemplation of a bankruptcy." *Id.* at 338. The Court further noted that it would be anomalous if the Code required a review of fees charged by an attorney but prohibited a review of fees charged by a lay person providing legal advice regarding a bankruptcy. *Id.* (citing *Jones v. American Bankruptcy Council*, 1 B.C.D. 870, 871 (N.D.Ca.1974) (decided under § 60(d) of the former Bankruptcy Act)).

▪ Because NFM was never authorized to be employed and received payments from the debtors without prior approval, the Court holds that NFM must disgorge any and all sums paid to it in connection with or in contemplation of the Grimes' bankruptcy, including but not limited to the payments made by the Grimes to NFM totalling $5,811.87.

▪ The Court will next direct its attention to the sums paid to Kelly Papousek, the Grimes' bookkeeper. Papousek has no formal education in bookkeeping, accounting or tax work, but received some hands-on training under the supervision of another bookkeeper. Papousek handled Grimes' bookkeeping and tax work and also was a contractor with NFM. It was revealed at the hearing that Papousek is the son of Lois Bellman, NFM's President. Papousek charged the Grimes $40.00 per hour for bookkeeping work. NFM charged Grimes $50.00 per hour for work performed by Papousek for NFM.

The following cancelled checks from the Grimes to Papousek were received into evidence at the hearing:

| Exhibit | Date | Amount | Comment |
|---|---|---|---|
| 1 | 1–15–87 [1] | $ 80.00 | Bookkeeping |
| 3 | 2–2–87 [2] | $ 120.00 | Tax work |
| 4 | 2–5–88 | $ 60.00 | Bookkeeping |
| 6 | 2–9–88 | $3,500.00 | Chapter 11 filing fee & Needler retainer |
| 7 | 2–15–88 | $ 72.00 | Bookkeeping |
| 11 | 9–8–88 | $3,010.00 | Needler retainer |
| 15 | 12–16–88 | $1,420.00 | Money returned, replaced with Exhibit 20 |
| 16 | 12–16–88 | $ 42.00 | Fees—plan confirmation |
| 17 | 1–6–89 | $ 150.00 | Accounting fees |
| 18 | 1–20–89 | $ 136.20 | Fees [3] |

Exhibits 1, 3, 4 and 7 appear to be for bookkeeping expenses incurred pre-petition. Exhibits 6 and 11 were for the Chapter 11 filing fee ($500.00) and Attorney Needler's retainer ($6,010.00). Exhibit 15 was a check replaced by Exhibit 20. This was the additional retainer for Attorney Needler in the amount of $1,420.00. Exhib-

**1.** Mrs. Grimes testified that the date on this check was in error. It was actually written in 1988.

**2.** Mrs. Grimes testified that the date on this check was in error. It was actually written in 1988.

**3.** Mrs. Grimes testified that this check was intended for Papousek and NFM.

its 16, 17 and 18, totalling $328.20, are for services performed post-petition and without authorization of the Court. Based on the analysis relating to the fees to be disgorged by NFM, the Court would likewise order Mr. Papousek to return $328.20 to the Grimes for his failure to receive Court authorization for services or payment.

Finally, the Court will address the payment received by appraiser Jarvis Brown from the Grimes. Exhibit 13 shows that Mrs. Grimes paid Brown $405.60 on December 16, 1988 for an appraisal conducted in preparation for a § 506 valuation hearing, which was later settled. Mrs. Grimes testified that she paid Brown directly on the instructions of James Truax, Attorney Needler's associate.

Sections 327 and 330 of the Bankruptcy Code apply to professional persons such as appraisers. Attorney Truax knew or should have known that Brown's employment and allowance for fees both had to be approved by the Court, and the Court can think of no rationale that would allow for the engagement and payment of an appraiser without prior Court approval. Because Brown accepted payment despite the failure to have his employment authorized or his compensation approved, and based on the previous analysis concerning the disgorgement of fees, the Court will order Brown to return $405.60 to the Grimes. It must be noted that, as a general practice, the debtor's attorney makes application for the employment of professionals such as appraisers. The debtors' attorney failed to do so here, and this Court's decision requiring Brown to disgorge the sum paid to him by the debtors should not be interpreted as foreclosing any causes of action the appraiser may possess for the failure of the debtors' attorney to secure authorization for his employment.

## CONCLUSION

The Court's review of the fee applications in this case reveals several anomalies. First, Attorney Needler has been involved in numerous bankruptcies and has practiced before the federal courts at both the trial and appellate levels, including the United States Supreme Court. Given his experience, the Court cannot understand the necessity of engaging NFM, which only resulted in a duplication of effort and fees. Second, Attorney Needler is an experienced practitioner in bankruptcy law and should know that the requirements for fee applications are quite stringent. Despite this, his fee application and supporting documentation were not on a par with someone of Attorney Needler's expertise. At first blush, the Court's carte blanche reduction of Attorney Needler's hourly rates might seem harsh. However, Attorney Needler and his firm have been warned by other courts that there is an inherent risk in running one's practice in a shipshod manner. *See In re TCI, Ltd.*, 769 F.2d 441 (7th Cir.1985). Third, NFM claims that it has been involved with numerous bankruptcies. The Court would infer from this that NFM would be familiar with the process for obtaining Court authorization for employment and payment. The Court rejected NFM's first application for employment because the necessity of their services was not sufficiently explained. The Court's request for further information apparently was ignored, even though NFM knew or should have known that prior approval for employment was required. The presumption of the value of NFM's services and its failure to receive prior approval for payment are fatal.

As it currently stands, the debtors have paid out almost $14,000.00 for professional fees in an uncomplicated case. The Court's blind approval of this inflated amount and expenses would be tantamount in condoning pillage and plunder of the debtors' estate.

William L. Needler & Associates received a retainer from the debtors totalling $7,430.00. The Court finds the reasonable value of his services to $4,990.21. Hence, William L. Needler & Associates will be ordered to disgorge a total sum of $2,439.79.

National Farm Management, Ltd. failed to receive authorization for employment or approval for payment from this Court. No extraordinary circumstances are present

**652**

that would warrant the approval of its application nunc pro tunc. Hence, National Farm Management, Ltd. will be ordered to disgorge all sums, including but not limited to $5,811.87, paid to them in connection with or in contemplation of the Grimes' bankruptcy.

Bookkeeper Kelly Papousek received $328.20 from the Grimes for post-petition bookkeeping or tax work. He will be ordered to disgorge this amount because of his failure to receive Court authorization for employment or approval for payment.

Appraiser Jarvis Brown received $405.60 from the Grimes for an appraisal. He will be ordered to disgorge this amount because of failure to receive Court authorization for employment or approval for payment. The Court will enter an appropriate order.