**In re DELAWARE RIVER STEVEDORES, INC., Debtor.**

**Bankruptcy No. 91–13673S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Nov. 13, 1992.

---

professionals from the proceeds of a Debtor's estate. We conclude, as we have in the past, that our independent review of such applications and, specifically, the hourly rates which professionals seek to charge, is an important though unpleasant duty which we must perform to fulfill our duty of office to the public. We also conclude that it was proper for this court to have reduced the hourly rate of the Debtor's former lead counsel from $290 per hour to $250 per hour. Therefore, although we will allow most of the requests of the Debtor's counsel for additional reimbursement for expenses, which requests were fully explained by counsel for the first time in the application for reconsideration, we will deny a request for an upward adjustment in compensation of the Debtor's counsel for services performed.

## B. PROCEDURAL AND FACTUAL HISTORY

DELAWARE RIVER STEVEDORES, INC. ("the Debtor"), a provider of maritime cargo handling services, filed a voluntary Chapter 11 bankruptcy case on July 2, 1991. The law firm of Hoyle, Morris & Kerr ("Hoyle") filed an application for appointment as counsel on the day of the bankruptcy filing, which was granted *ex parte*, pursuant to Local Bankruptcy Rule 9013.3(b)(6), on July 3, 1991.

From the outset, the specific Hoyle attorneys who provided most of the services to the Debtor were John Francis Gough, Esquire ("Gough"), an outstanding, experienced bankruptcy practitioner; and Nathalie D. Martin, Esquire ("Martin"), who, while considerably younger than Gough, is a skilled and experienced bankruptcy lawyer in her own right.[1]

As it developed, the most vigorously-contested litigation in this case was filed at its outset, tried, and decided by July 16, 1991. That litigation involved the Debtor's attempt to prevent the United States Department of Labor ("the DOL") from demand-

Nathalie D. Martin, Hoyle, Morris & Kerr, Philadelphia, PA, Cornelius V. Gallagher, New York City, John Francis Gough, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, Atty., for debtor.

Pace Reich, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, for creditors' committee.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

## A. INTRODUCTION

The instant application for reconsideration of an interim fee application requires this court to reconsider its function in the process of allowance of compensation to

---

1. The application included no biography of these individuals and none was provided at the hearings on the fee applications. Our observations are made on the basis of frequent experiences with counsel in our court.

ing payment on a letter of credit issued by the Debtor's secured lender as security for the Debtor's payments under a self-insured workmen's compensation plan. In an Opinion arising out of this litigation, reported at 129 B.R. 38, we extended an injunction preventing the DOL from drawing on the letter of credit, entered on July 11, 1991, through only July 19, 1991, unless the Debtor filed a motion in which it agreed to remain current on post-petition workmen's compensation payments. *Id.* at 43–44. The Debtor filed no such motion nor an appeal from our decision, and the DOL ultimately drew down the letter of credit.

Although the Debtor was therefore unsuccessful in the only contested matter which resulted in a published Opinion arising out of this case, it was thereafter much more successful in negotiating agreements with its unsecured creditors, the labor unions whose members it employed, the injured former workers, and the DOL. Closing several of its operations, most notably a terminal in Camden, New Jersey, resulted in an increased margin of profitability at the Debtor's remaining terminal site. On March 5, 1992, this court sustained the Debtor's attempt to classify all workmen's compensation claims arising from entities which were predecessors of the Debtor as pre-petition claims subject to the automatic stay and discharge. This greatly aided the Debtor in the formation of a reorganizational plan. In the course of the case, a private workmen's compensation insurer was obtained to replace the Debtor's self-insured status. A negotiated settlement was reached with the longshore workers' unions and their respective benefit funds. The Debtor effected a merger with a large national stevedoring company. All of these events contributed to the Debtor's successful reorganization. As the Debtor indicated in its Disclosure Statement, this case "has been marked by general cooperation rather than opposition from … creditors."

The Debtor filed its initial Plan of Reorganization and Disclosure Statement on May 1, 1992, within deadlines established by this court in an Order of November 21, 1991. The Plan and Disclosure Statement were amended in several minor respects three times between May 1, 1992, and June 12, 1992. The Third Amended Plan was confirmed with broad creditor acceptance and without objection on July 22, 1992.

Our overall evaluation of this case is that it was, first of all, a successful Chapter 11 case. It presented some moderately difficult issues which were handled well by, principally, Gough and Martin. The only major litigation was unsuccessful, but counsel recovered quickly from this setback and achieved a fine result. While Gough was instrumental in setting the course of this case, we note that he left the Hoyle firm during the course of this case, apparently in late June, 1992. No noticeable hitches or breaks in continuity occurred after Gough's departure, because Martin very ably accepted lead counsel responsibilities in the case thereafter.

Gough filed Hoyle's initial application for interim compensation on February 27, 1992, requesting compensation for services rendered of $232,294.00 and reimbursement for costs expended in the amount of $21,165.30 for the period between July 2, 1991, and January 31, 1992. Apparently subsequently realizing that the application did not comply with (then) L.B.R. 2002.3(b)(3),[2] which required a breakdown in time spent on each motion or adversary proceeding in applications requesting in excess of $100,000, Hoyle withdrew this application and filed an amended application on April 15, 1992. After a Certification of No Objection, we entered an Order of June 8, 1992, granting Hoyle compensation of $208,077.59 and reimbursement of $20,624.37.

Most of the reductions from this application were the result of three rulings, prominently noted directly on the original copy of the application: (1) a reduction of Gough's requested hourly rate of $290 to $250, for 491.3 hours of service, which in itself resulted in a reduction of almost $20,000; (2) disallowance of all time spent on

**2.** This provision has been reworded and renumbered as L.B.R. 2002.2(a)(3) in amendments effective July 31, 1992, but remains substantially the same as the predecessor-rule.

the preparation of the fee application itself; and (3) deduction of costs for local travel and "administrative overtime."

With respect to the issue of hourly rates, we noted that no Hoyle professional other than Gough had claimed an hourly rate in excess of $158/hour. The rate requested for Martin, who performed 453.1 hours of services, was but $138/hour. There was no appeal from, or request that we reconsider, our Order of June 8, 1992.

On August 5, 1992, Martin filed Hoyle's second application for interim compensation ("the 2nd App."), seeking a total of $237,186.60 as compensation for services rendered and $18,821.13 as reimbursement of costs in the period from February 1, 1992, through July 22, 1992, the date of confirmation. On September 4, 1992, the United States Trustee ("the UST") filed the following Objections to the 2nd App.:

A. The applicant has failed to describe with specificity and particularity the nature of the tasks performed.

B. The applicant has included items in the fee application that are attributable to overhead.

C. The nature of the work performed does not justify the time spent.

D. The applicant charges for preparation of the fee application.

E. The applicant seeks reimbursement for expenses that were not actual and necessary.

F. The application fails to contain vouchers or receipts for the claimed expenses.

G. Work performed at a higher rate, *i.e.*, senior partner, could have been performed at an associate level.

H. The cost of for duplication of copies is too great.

A hearing on the 2nd App. was scheduled on September 30, 1992, attended only by Martin on behalf of Hoyle and an Assistant United States Trustee ("AUST"). We expressed our particular concern with Hoyle's request for compensation totalling $4,720.10 for preparing the 2nd App. itself and a total of $147,296.60 for preparing the Plan and Disclosure Statement. Services in the latter category included 363.5 hours of services performed by Gough and 278.9 hours of services performed by Martin, and an overall total of 662.8 hours.

At the hearing of September 30, 1992, we expressed some surprise that the labors on the Plan and Disclosure Statement were so extensive, even though we acknowledged that they had been well done. This was especially so in light of the consensual mode that had developed in the case by the time that the plan-confirmation stage of the case was reached. We stated that we found it difficult to compensate Gough at a rate above $250/hour, considering, *inter alia*, that he had performed such extensive and apparently excessive services on this aspect of the case.

The AUST present at the hearing voiced no opinion on any specific aspects of the 2nd App. He stated that Hoyle and he had agreed to a reduction of $5,057.26 from the 2nd App., the computation was unclear, even though it was memorialized in the UST's Supplemental Response to the 2nd App.

On the same date as the hearing, this court entered an Order of September 30, 1992, allowing Hoyle $203,418.50 for services performed and $12,087.85 as reimbursement for costs expended. As an explanation for most of the deductions, we stated as follows:

Mr. Gough's rate is reduced to $250/hr., in light of the very large number of hours spent on the Plan and Disclosure Statement, and his hours are reduced to 500 compensable hours [from 531.2 total hours]. The fee application time is deducted, as well as the costs for stapling, labelling, etc., which is overhead, and more than 20¢/pg. for in-house copying. All disallowances are noted on the Application. This Order is final unless an Application requesting a further hearing is filed and served upon the court in chambers and the U.S. Trustee within 10 days from the date of this Order.

On Monday, October 13, 1992, Hoyle, per Martin, filed the application for reconsideration of the September 30, 1992, which is presently before us for disposition. A

hearing on this application was conducted on November 4, 1992, and it again consisted, in substance, of a colloquy between Martin, the AUST, and the court.

With respect to costs, Martin first addressed a $2,109.30 deduction from the request for photocopying costs. She noted that, although the 2nd App. had not expressly recited on it the rate for same, Hoyle had in fact charged 20¢/page, not 25¢/page, as the UST had alleged, and the court had assumed, in deducting $2,109.30. Therefore, the court had unwittingly reduced Hoyle's in-house copy rate to 15¢/page.

Martin also addressed Hoyle's requests, totalling $4,212.11, for "mailouts" and "copies, stapled, collated, stuff, labelled and stuffed" which this court had disallowed as overhead. She explained that these entries reflected services performed by outside contractors and paid by Hoyle, which were charged at a rate of 9¢/page to 15¢/page, depending on the bulk of the work performed, for photocopying *and* the stapling, collating, etc. Receipts were attached to document $132.15 in local transportation costs. Ultimately, Martin agreed to withdraw the local transportation cost request, in light of the court's advice that it considered such expenses non-compensable overhead.

With respect to the disallowed requested payments for services, Martin conceded that the time for preparation of the fee application should be excluded. She argued that the category of Plan and Disclosure Statement included negotiations on the plan as well as drafting. Ultimately, she was willing to accept the court's reduction of Gough's hours from 531.2 to 500. However, while again providing no evidence of the local market rates nor details regarding the background and experience of Gough, she argued that the good result of the case justified restoration of Gough's requested $290/hour rate.

Despite the court's repeated requests, the AUST provided no comment on the allowability of the costs requested, nor on the issue of the proper allowable hourly rate for Gough.

## C. DISCUSSION

### 1. *This Court Must Always Review Hourly Rates Requested by Professionals, Sua Sponte If Necessary.*

■ The posture of the application for reconsideration before us requires this court to initially confront once again the issue of whether it is appropriate for this court to review fee applications *sua sponte* when there is no objection thereto, or, as in the case here, after any objections are withdrawn or resolved. We continue to believe, for reasons expressed at some length most recently in *In re Rheam of Indiana, Inc.,* 137 B.R. 151, 155–59 (Bankr. E.D.Pa.) ("*Rheam IV*"), *rev'd on other grounds,* 142 B.R. 698 (E.D.Pa.1992) ("*Rheam V*"), this unpleasant and thankless task cannot be avoided.

We do not consider it necessary to reiterate the citations, included in *Rheam IV,* of decisions of the Third Circuit Court of Appeals, 137 B.R. at 156; prior decisions of the local district court, *id.;* and uniform decisions from over one-third of the 91 federal districts in the country, *id.* at 157, which have held that the bankruptcy court always retains the power and duty to review fee applications *sua sponte.*

We do note two decisions subsequent to our rendering our decision in *Rheam IV* which touch upon this subject. Firstly, in *In re Paul,* 141 B.R. 299, 301 (E.D.Pa. 1992), Judge Bartle of the district court commented as follows:

Proceedings in the Bankruptcy Court are often non-adversarial, in contrast to most civil litigation in the District Court. Where no one files an objection to a fee application, the Bankruptcy Court has the duty to review the request to determine whether the attorney is seeking "reasonable compensation." If the Court below has concerns about the amount sought or the hours or nature of work performed, it must hold a hearing, as required under § 330 of the Bankruptcy Code, in order to afford the attorney an opportunity to present his or her position and respond to the Court's questions

about the application. The Bankruptcy Court, however, may not reduce the amount sought without a hearing. In failing to hold a hearing and make appropriate findings, the Bankruptcy Court erred.

Also, Judge Gawthrop, possibly qualifying his strong statement of the right and duty of bankruptcy judges to review fee applications *sua sponte* in *In re Rheam of Indiana, Inc.*, 133 B.R. 325, 330–33 (E.D.Pa.1991) ("*Rheam III*"), stated, as follows, in *Rheam V, supra,* 142 B.R. at 700:

> Generally, the Bankruptcy Court has broad discretion to deny professional fees, subject to abuse-of-discretion review. *In re: Lawrence Paster*, 119 B.R. 468, 469 (E.D.Pa.1990). However, that discretion is more limited when considering an unopposed application for approval of fees, as here. *In re: T & D Tool, Inc.*, 132 B.R. 525, 526 (E.D.Pa.1991), citing, *In re: Jensen's Interiors, Inc.*, 132 B.R. 105 (E.D.Pa.1991).

In *Rheam III*, 133 B.R. at 332–33, Judge Gawthrop was prepared to state that he "departed" from the holding of, *inter alia,* Judge Newcomer in *Jensen's Interiors.* In *Rheam V*, he appeared to be attempting to harmonize his holdings in *Rheam III* with that of, *inter alia, Jensen's Interiors.*

In a short Memorandum published on remand in *Paul*, 1992 WL 153596 (Bankr. E.D.Pa. June 23, 1992), we expressed some surprise that, despite that our perceived error was a failure to conduct a hearing before reducing a fee application *sua sponte,*[3] the matter had not been remanded *for* that hearing, but that the district court had directed us to award counsel outright all of his requested fees. We also stated as follows, *id.,* slip op. at *1:

> However, in an attempt to avoid future results similar to this appeal, which add needlessly to the workload of the district court and this court, we will add a phrase in substantially the following language

to any Order entered by this court which represents a *sua sponte* fee reduction without a hearing: "This Order will become final unless, within ten days of the date of this Order, the applicant requests a hearing in this court by filing an Application for such a hearing with the court, and sending a copy of the Application to the United States Trustee and this court in chambers."

In this way, we compromised our prior holding in *Rheam III, see* page 869 n. 3 *supra,* to accommodate the concern expressed by Judge Bartle in *Paul.*

It was the addition of a phrase similar to that which we promised to append to *sua sponte* fee reductions in the September 30, 1992, Order, even though it was entered after an initial hearing, which resulted in the instant application and the hearing of November 4, 1992. We note that Hoyle failed to timely serve the court in chambers with the instant application, as required per the September 30, 1992, Order. We will not deny this application on the basis of this non-conformity to the procedure for reconsideration outlined in our Order of September 30, 1992, although we may well do so in the future, when the procedure becomes better known.

We continue to believe that no less than the integrity of the bankruptcy system and, ultimately, the entire court system, is at stake in the issue of a bankruptcy judge's performance of the duty to review fee applications *sua sponte.* The public expects, and has a right to expect, that an order of a court is a judge's certification that the result is proper and justified under the law. We frequently read in newspaper stories that the public has a perception that bankruptcies are too expensive and that high professional fees are a significant cause of these high expenses. Nothing better serves to allay these perceptions and fulfill public expectations than the recognition that a bankruptcy judge, before a fee application is approved, is obliged to carefully review same and find it personally accept-

**3.** No authority was cited for the principle that a hearing was required before a fee application could be reduced by this court *sua sponte.* In *Rheam IV*, 137 B.R. at 155, this court cited, *inter* *alia, Blum v. Witco Chemical Corp.*, 829 F.2d 367, 377–78 (3rd Cir.1987), for the principle that no such a hearing was required.

able, irrespective of the (always welcomed) observations of the UST or other interested parties.

We believe that a significant improvement of the fee application procedure would be effected by the development of firm and fair guidelines for, *inter alia*, procedures for preparation of applications, allowable items of costs, and hourly rates, formulated by the concerted efforts of the UST, the bar, and the client community, as well as the bench. Such guidelines would not eliminate judicial intervention, because a bankruptcy judge would nevertheless be charged with the duty of seeing that the guidelines were followed or that abuses of the guidelines did not creep in. However, much of the troublesome subjective issues which are involved in the resolution of the instant application could be eliminated or at least defused if such guidelines were adopted.

However, since no such guidelines exist at present, we are obliged to endeavor to perform our duties without them.

2. *This Court Will Restore Most of the Reimbursements for Costs Which it Previously Disallowed, in Light of Hoyle's Supplemental Explanations Regarding Same.*

▇ With respect to the requests that we supplement our allowance of costs requested in the 2nd App., we are troubled mostly by the failure of the 2nd App. to indicate the rate charged for in-house duplication or to include receipts and vouchers, or adequate explanations, of the items for which reimbursement was sought but denied. This court's guidelines for requests for reimbursements of costs are clearly set forth in *In re Mayflower Associates*, 78 B.R. 41, 47–48 (Bankr.E.D.Pa.1987). We should not have to be burdened with a professional's belated compliance with the *Mayflower* guidelines only at the time of the filing of a motion for reconsideration after an initial award on a fee application.

Furthermore, we note some irony in the fact that the outside contractor employed by Hoyle to do certain copying services charged 15¢ per page or less, and per-

formed other services as well, such as collating or stapling, at this rate. It follows that, if Hoyle had sent all of its copying work to an outside contractor, the 15¢/page rate to which we erroneously reduced Hoyle's photocopying services in our Order of September 30, 1992, would have covered the actual copying costs. This suggests that our 20¢/page allowance for in-house photocopying is, if anything, too liberal.

Nevertheless, in a spirit of liberality, we are prepared to restore the $2,109.30 which we reduced from the copying allowance, and the $4,121.11 paid to outside services for copying and other services related to copying. We would not have deducted the $2,109.30 if we had known that the figure requested already contemplated photocopying costs measured at the rate of 20¢/page. Similarly, we would not have deducted the $4,212.11 for outside services if we had known the nature of these services, *i.e.*, copying plus related services, and that these services were performed at a rate reduced from the maximum allowable for copying in-house. We will therefore reconsider and allow these amounts as reimbursement for costs.

3. *The Establishment of Gough's Hourly Rate at $250/Hour, as Opposed to the Requested Rate of $290/Hour, Will Not be Disturbed.*

Remaining for consideration is only the issue of Gough's allowable hourly rate. We note at the outset that this court has addressed the issue of fixing appropriate hourly rates for professionals at length in two prior decision.

In the first, *In re Shaffer–Gordon Associates, Inc.*, 68 B.R. 344, 346, 350–51 (Bankr.E.D.Pa.1986), we considered whether it was appropriate, at that time, to limit professionals' hourly rates of compensation to $200 hourly, particularly in the face of counsel's request for compensation at $230.37 hourly for services performed in that case. *Id.* at 346. We began by noting that it would be inappropriate to set an inflexible cap on hourly rates, as "inflation ... [or] the combination of a case requiring extra ordinary skill and the demonstration

of such skill by extremely competent counsel could justify a higher rate, ..." *Id.* at 350. However, we also noted that allowing self-proclamation and/or self-declaration of market rates to absolutely control the fixing of hourly rates was unacceptable, as it would further an unchecked upward spiral. *Id.* Therefore, we concluded that

> it is absolutely necessary that we take an active role in evaluating the work performed and the total requests and hourly rates requested in fee petitions which come before us....
>
> ... it is for the Court to determine what a reasonable hourly rate for a certain task is....

*Accord, e.g., Daggett v. Kimmelman,* 811 F.2d 793, 799 (3rd Cir.1987); and *In re S.T.N. Enterprises, Inc.,* 70 B.R. 823, 842–43 (Bankr.D.Vt.1987). We also expressed a hope that a standardized rate structure, as was suggested by the Third Circuit Task Force, *Court Awarded Attorney Fees,* 108 F.R.D. 237, 260–62 (1985), would be devised to meet this problem. 68 B.R. at 351. That hope, not having been realized to date, is again expressed in this Opinion. *See* page 870 *supra.*

We again considered at length the appropriate hourly rates to be allowed to counsel, though in the different context of an application for compensation of counsel for a Chapter 7 trustee, in *In re Rheam of Indiana, Inc.,* 111 B.R. 87, 96–99 (Bankr. E.D.Pa.1990) ("*Rheam II*"), *aff'd in part & remanded in part, Rheam III, supra.* In that case, the district court had initially disapproved our limiting the trustee's counsel to a rate of $125/hour at the outset of the case. *In re Rheam of Indiana, Inc.,* 98 B.R. 193 (E.D.Pa.1989) ("*Rheam I*"). In considering the difficulty of the task performed, the prevailing market rate for counsel of like experience, counsel's own normal billing rate, and the rates allowed by other courts in similar circumstance, the

criteria articulated as appropriate to determine the proper hourly rate of a professional at the conclusion of services in *Rheam I,* 98 B.R. at 194, we set the allowable hourly rate in that case at $125/hour. *Rheam II,* 111 B.R. at 96. In the course of considering the rates set by other courts in like circumstances, we cited numerous cases in which hourly rates had been established in other bankruptcy cases and cases decided by the Court of Appeals and the district court in this jurisdiction. *Id.* at 97–98. Even with adjustments of the rates allowed in older cases far in excess of the Consumer Prices Index ("CPI") over the period since the decision, *id.* at 98, we found $125/hour to be a reasonable overall rate for counsel generally in a bankruptcy case. With respect to counsel's normal billing rates, we looked to the rate of a junior associate for the trustee's counsel who had performed many of the most difficult tasks involved in the case, which was fixed at $125/hour. *Id.* at 96–97. We then concluded that, in light of the relatively straightforward nature of the services performed, an hourly rate of $125/hour to counsel for the trustee in that case was quite appropriate. *Id.* at 99. That aspect of *Rheam II* was affirmed in *Rheam III.* 133 B.R. at 333–35.[4]

■ We reaffirm the underlying common principle in *Shaffer–Gordon* and *Rheam II* that this court must ultimately be the arbiter of an appropriate hourly rate chargeable by every professional in every case. This does not mean that we will frequently change the billing rates claimed by counsel, but only that we will check those rates which appear out of line with the market rates. Our reference point of the contemporary market rates is of course established by our review of literally dozens of fee applications daily and thousands of fee applications annually.

---

4. The *Rheam III* court criticized only the use of the CPI in adjusting rates from other cases to the present, indicating that it considered same to be "unscientific." 133 B.R. at 334 n. 7. We would, however, note that the CPI is precisely what is required to be used in adjusting rates under the Equal Access to Justice Act. 28 U.S.C.

§ 2412(d)(2)(A)(ii). *See DeWalt v. Sullivan,* 963 F.2d 27 (3rd Cir.1992). We are at a loss to ascertain a more reliable means of adjustment, although we have tried to avoid this factor by citing contemporary cases in our comparisons with cases from other jurisdictions at page 872 *infra.*

■ Our experience with a survey of other fee applications has resulted in our finding that, at present, $250/hour is the highest rate which we will generally allow to be charged by the most experienced local practitioners in our court. Very few ever ask for more, and those that do have rarely chosen to contest this upward guideline. Hence, the bar has apparently uniformly accepted, or at least became resigned to, our $250 maximum guideline at present. Also, on occasion, as when counsel is not local and establishes higher overhead, *e.g.*, offices in New York City, or has performed very difficult work in an important and difficult case, we have allowed rates in excess of $250/hour.

Thus, in the six years since *Shaffer–Gordon* was decided, we have gradually allowed inflation to lift our upward benchmark of $200/hour to $250/hour. We believe that this twenty-five (25%) percent increase has more than kept pace with inflation per the CPI. We continue to believe that it is necessary to set *some* absolute upward limit on professionals' hourly rates, which is to be exceeded only in extraordinary situations, or we will effectively abdicate our responsibilities, which we believe would be corrosive to the bankruptcy system.

We recognize that the level of skill necessary to accomplish the successful result in this case is in excess of that needed to successfully administer the *Rheam* case. We note that, relative to *Rheam*, we are willing to allow a compensation rate of *double* that allowed the counsel in *Rheam* to Gough in this case. In considering the instant Application, we have carefully reviewed the factors set forth in *Rheam I* to determine whether a higher rate of compensation than $250/hour was warranted in this case.

Firstly, we looked at data from other courts. We note that a national survey of 650 law firms, reported at 22 B.C.D. Weekly News and Comment, at A1, A4 (April 30, 1992), states that "the average billing rate for all partners/shareholders was $172 per hour in 1991, up from $159 for the year before." We were thus willing to allow

Gough a considerably higher rate than the $172 national average for comparably skilled partners in bankruptcy firms.

Secondly, several recent decisions were surveyed. These included *In re Allegheny Int'l, Inc.*, 139 B.R. 336, 339 (W.D.Pa.1992) ("the market rate in Western Pennsylvania for bankruptcy counsel of high calibre is $150 per hour"); *In re East Peoria Hotel Corp.*, 145 B.R. 956, 964 (Bankr.C.D.Ill. 1991) (court has established the rate for "senior partners" at $150/hour); *In re Cambern*, 134 B.R. 565, 571 (Bankr. E.D.Tex.1991) ($150/hour "mandatory fee cap" for that district moved *up* to $165/ hour); *In re Waldoff's Inc.*, 132 B.R. 329, 336 (Bankr.S.D.Miss.1991) (maximum hourly rate in district set at $125/hour); *In re Holub*, 129 B.R. 293, 298 (Bankr.M.D.Fla. 1991) ("$125 per hour is the maximum reasonable hourly rate which the court can approve"); *In re Grimes*, 115 B.R. 639, 644 (Bankr.D.S.D.1990) ($100 per hour is "the highest hourly rate currently charged by a bankruptcy practitioner in this District"); and *In re Wendy's of Montana, Inc.*, 111 B.R. 314, 316 (Bankr.D.Mont.1988) ("$110 per hour was the maximum fee charged by local attorneys," which was applied in that case even though counsel billed his time at $175/hour). *See also In re Spillane*, 884 F.2d 642, 647 (1st Cir.1989) (district court held to have properly relied upon its "own experience with attorney charges in the district" in reducing attorney's hourly rate from $125/hour to $90/hour). *Compare Bodine v. Federal Kemper Life Assurance Co.*, 138 B.R. 88, 92 (M.D.Fla.1992) (counsel allowed $300/hour because of "contingency and character of ... representation"); and *In re Holywell Corp.*, 138 B.R. 1010, 1014 (Bankr.S.D.Fla.1992) ($295/hour rate allowed to counsel because this was found to be a reasonable rate in counsel's area of local practice in the District of Columbia). Thus, the rate which we were willing to allow Gough was considerably higher than the maximum allowed in many jurisdictions, at least per the reported cases.

Thirdly, we were influenced by the great disparity between the rate requested by Gough and that requested by other Hoyle attorneys, notably Martin, for their servic-

es performed in this case. Martin's rate has remained at $138/hour. Yet, there has been no noticeable diminution in the quality of the Debtor's representation since she has been thrust into the role of lead counsel. This is of course to be taken as a testament to Martin's own poise and professional growth, and not as a criticism of Gough. Doubtless, Gough served as Martin's mentor, and his vast experience and gracious manner obviously was instrumental in setting the course of the Debtor's case in its crucial stages. We in no sense wish to detract from Gough's statute as a top-flight practitioner who is justified in receiving the highest rates allowable in this district, where appropriate. However, the comparison of Gough's past tenure as lead counsel with Martin's present tenure as lead counsel suggests that Gough may have been able to delegate a greater part of his services to his junior associate, Martin, than he did. *Compare Rheam II, supra,* 111 B.R. at 96–97 ($125 maximum rate justified in part because a junior associate billing at that rate appeared quite capable of handling the most difficult matters presented in the case).

Finally, we consider the number of hours spent by Gough on the preparation of the Plan and Disclosure Statement in this case to be unreasonably high for even a junior associate, let alone an attorney of his stature. We note that there was very little in dispute during this process and nothing which could be termed litigation in the disclosure and plan confirmation process was determined to be necessary. While it is appropriate to observe that wise and experienced lawyers such as Gough are to be commended for their efficacy in accomplishing ends through negotiation rather than litigation, it is nevertheless also appropriate to observe that litigation is sometimes unavoidable and that it is a more demanding activity than draftsmanship and therefore may justify compensation at a premium rate more readily than other services.

At the hearing on November 4, 1992, Martin emphasized that, although 363.5 of Gough's hours were allotted to the category of "Plan and Disclosure Statement" in the 2nd App., much of this time was actually spent in negotiating the successful, consensual plan. However, Gough's time records themselves designate a vast majority of this time as pure *draftsmanship* of these documents, *e.g.,* they are simply as "Drafting Plan and Disclosure Statement." Since there were no significant objections raised to the plan and disclosure statement as originally conceived and no complete redrafts were necessary, the time spent on draftsmanship was, in our opinion, excessive. In addition, Martin herself devoted considerable time (278.9 hours) to assisting and completing these drafts. We simply cannot justify allowing Gough a premium rate when he has taken more time than a competent associate could have been expected to consume in performing a significant portion of his declared services.

Furthermore, as we explained to Martin at the November 4, 1992, hearing, we were initially inclined to reduce Gough's compensable time significantly *below* the 500 hours allowed to him. However, since we were prepared to reduce his hourly rate, we were very liberal in allowance of his compensable time.

Thus, the difficulty and efficiency levels of at least part of the services performed by Gough did not justify a premium billing rate. The billing rate of co-counsel at a far lower rate undercuts the argument that Hoyle's "normal billing rate" approaches $290/hour. Other courts have rarely allowed rates approaching even the $250/hour which is our present maximum hourly guideline, let alone the $290/hour rate requested. Therefore, application of the *Rheam I* criteria, *see* page 871 *supra,* does not justify an adjustment to Gough's allowed hourly rate of $250/hour. Despite our appreciation of, and allowance for, Gough's competence and the success achieved in this case, we simply do not believe we can bend any further in good conscience beyond allowing Gough to be compensated $250/hour for 500 hours of services in this case. We also note that the rate utilized in ruling on the 2nd App. was the same rate which we applied to Gough

in ruling upon Hoyle's *first* interim fee application, which ruling was not contested.

We therefore must decline Hoyle's request to further enhance the sum granted to it in our Order of September 30, 1992, by increasing Gough's hourly rate above $250/hour.

## D. CONCLUSION

An Order consistent with the conclusions reached herein will be entered.

### ORDER

AND NOW, this 13th day of November, 1992, after a hearing of November 4, 1992, on the Application of Hoyle, Morris & Kerr, counsel for the Debtor ("Hoyle"), for Reconsideration of the Order of this Court of September 30, 1992, allowing Hoyle interim compensation for services rendered of $203,418.50 and for reimbursement of expenses incurred of $12,082.85, during the period between February 1, 1992, and July 22, 1992, it is hereby

ORDERED that the Application is GRANTED in part only. Hoyle is allowed additional reimbursement for expenses incurred of $6,321.41. In all other respects, the Application is DENIED.