**In re DUBIN PAPER COMPANY d/b/a Gallen Paper Company, Debtor.**

**In re HYGEIA PAPER COMPANY d/b/a Freidman Paper Company.**

**In re MAYER POLLOCK STEEL CORPORATION d/b/a Pollock Reading, Inc. d/b/a Phoenixville Scrap d/b/a Pollock Steel d/b/a Pollock Columbia d/b/a Pollock–Dixon d/b/a Montgomery Equipment Sales & Services, the Pollock Corporation, Debtors.**

**Bankruptcy Nos. 93–11368DAS, 93–11369DAS, 93–11975DAS and 93–119775.**

United States Bankruptcy Court, E.D. Pennsylvania.

June 23, 1994.

Peter A. Meltzer, Fellheimer, Eichen & Braverman, P.C., Philadelphia, PA, for debtors in Mayer Pollock Cases.

Robert Lapowsky, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, PA, for Creditors' Committee in Pollock Cases.

Gretchen Santamour, Lesser & Kaplin, Blue Bell, PA, for Continental Bank.

Michael F.J. Romano, Woodbury, NJ, for Orix Credit Alliance Corp.

Leonard P. Goldberger, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, for London Salvage.

Michael R. Lastowski, Saul, Ewing, Remick & Saul, Philadelphia, PA, for General Elec. Credit Corp.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

John E. Kaskey, Fellheimer, Eichen & Braverman, P.C., Philadelphia, PA, for debtors in Dubin Cases.

Jeffrey Kurtzman, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Philadelphia, PA, for PNC Bank.

Alan R. Gordon, Saul, Ewing, Remick & Saul, Philadelphia, PA, for Creditors' Committee in Dubin Cases.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Before this court are a creditor's Objections to, *inter alia,* the hourly rates sought to be collected in a request for interim compensation from related Debtors' estates by the law firm of Fellheimer, Eichen & Braverman, P.C. ("FEB"), the Debtors' counsel; and a motion of FEB for reconsideration ("the Motion") of hourly rates allowed by this court in prior Orders allowing interim compensation, also in their capacity as Debtors' counsel, from the estates of other related Debtors.

We reject FEB's apparent argument that the recent decision in *In re Busy Beaver Building Centers, Inc.,* 19 F.3d 833 (3d Cir. 1994), necessarily requires this court to

award FEB the same hourly rates which it claims to charge to clients in non-bankruptcy cases. Our survey of 1994 fee applications before this court causes us to conclude that the hourly rates sought by FEB on behalf of some of its professionals are properly subject to the modest reductions that we previously imposed. We therefore decline FEB's request to reconsider our prior Orders relating to one set of cases, and we will effect similar reductions in ruling on the Application in the other cases.

## B. FACTUAL BACKGROUND

FEB filed the related voluntary Chapter 11 bankruptcy cases of DUBIN PAPER CO. and HYGEIA PAPER CO. (collectively "the Dubin Debtors" or "the Dubin Cases") on March 8, 1993. John E. Kaskey, Esquire ("Kaskey") of FEB has served as the Debtors' lead counsel throughout the case. There has been an uneasy but stable relationship between the Dubin Debtors and their primary secured creditor, PNC BANK, N.A. ("PNC"), throughout the case.

By Order of July 22, 1993, we established a deadline of November 26, 1993, for the Dubin Debtors to file a plan of reorganization and accompanying disclosure statement. At a hearing on the propriety of the disclosure statement on December 23, 1993, we initially granted the Debtors until January 18, 1994, to file a projected amended consensual plan. The parties ultimately agreed to push the date of the filing of this prospective amended plan back to February 8, 1994, and then to March 9, 1994, and finally to April 20, 1994. At hearings of May 18, 1994, on the disclosure Statement filed on April 20, 1994, and on an amended version thereof on June 15, 1994, it became apparent, in that PNC filed objections thereto, that the plan ultimately produced was not consensual to PNC. On June 17, 1994, we were advised that some sort of agreement had been reached, and that the Dubin Debtors wished to file an entirely new plan by June 24, 1994. Our Order of June 20, 1994, establishing July 20, 1994, as the date for a hearing on the latest amended disclosure statement warns that, if this plan does not proceed through confirmation, these cases may be summarily converted to Chapter 7 cases.

On August 31, 1993, FEB filed, in the Dubin Cases, an Application seeking an award of interim compensation and reimbursement of costs expended for the period from March 8, 1993, to June 20, 1993, totalling $98,485.11. Over the Objections of PNC, we awarded FEB a total of $86,519.56 in an Order of October 27, 1993. In so doing, we reduced the hourly rates requested by certain of FEB's professionals as follows:

| ATTORNEY | YEAR OF LAW SCHOOL GRADUATION | RATE REQUESTED | RATE ALLOWED |
|---|---|---|---|
| Alan S. Fellheimer ("A. Fellheimer") | 1971 | $325 | $250 |
| David L. Braverman | 1978 | $300 | $250 |
| Judith E. Fellheimer ("J. Fellheimer") | 1973 | $263 | $240 |
| Kaskey | 1981 | $263 | $240 |
| J. Randolph Prince | 1983 | $235 | $210 |
| Thomas F. Payne | 1990 | $235 | $210 |
| Anna Hom | 1984 | $220 | $200 |

No further objections to the Order of October 27, 1993, were filed by any interested party.

On March 28, 1994, FEB filed a second Application seeking interim compensation and reimbursement of expenses totalling $69,807.96 for the period between June 21, 1993, and March 11, 1994 ("the 2nd Application"). On April 14, 1994, PNC filed an Objection to the 2nd Application, citing the Debtors' lack of progress in formulation of a confirmable plan and protesting the hourly rates requested by FEB as follows:

the hourly billing rates applicable to the members and associates of [FEB] are excessive and should not be allowed. For

instance [A.] Fellheimer has billed time in this matter at the hourly rate of $325.00, while three other partners in [FEB] have an hourly billing rate in excess of $263.00. The hourly billing rates for partners, associates and paraprofessionals are significantly higher than the rates charged by comparable practitioners in this district. Those rates are in conflict with the principles articulated by this Court in *In re Delaware River Stevedores,* 147 B.R. 864 (Bankr.E.D.Pa.1992), in which an hourly billing rate of $250.00 was established as a maximum allowable rate [except] for extraordinary services. [PNC] submits that the services for which compensation is sought in the Application do not meet the standards articulated in the *Delaware Stevedores* decision and do not therefore justify the award of compensation based on the extraordinarily high hourly rates reflected in the Application....

A hearing on these Objections was scheduled on May 25, 1994.

The related voluntary Chapter 11 bankruptcy cases of MAYER POLLOCK STEEL CORP. and THE POLLOCK CORP. (collectively, "the Pollock Debtors" or "the Pollock Cases") were filed on April 3, 1994. On behalf of FEB, Hom acted as lead counsel until late 1993, when she was replaced in that role by Peter E. Meltzer ("Meltzer").

An unusually bitter and prolonged struggle between the Debtor and its principal secured creditor, CONTINENTAL BANK ("Continental"), over the terms of periodic cash collateral orders, *In re Mayer Pollock Steel Corp.,* 157 B.R. 952, 955 (Bankr.E.D.Pa. 1993), dominated the Pollock Cases in their early stages. A truce between the Pollock Debtors and Continental regarding use of cash collateral was reached on August 25, 1993. However, the terms of this agreement required monthly payments of both principal and interest to Continental on its debt from the Pollock Debtors, which the Creditors' Committee ("the Committee") argued were excessive concessions. This court nevertheless approved such Orders with the caveat, in light of the Committee's claim that the Pollock Debtors had not made sufficient progress towards confirmation of a plan, that

requests for extensions of exclusivity would be strictly reviewed.

A plan and disclosure statement were directed to be filed by the Debtors by November 26, 1993, by our Order of July 9, 1993. The confirmation hearing, originally scheduled on February 23, 1994, was ultimately continued until April 6, 1994. After a hearing to consider confirmation and a renewed motion of Continental for relief from the automatic stay on that date, confirmation was denied; the Debtors' exclusivity was terminated effective May 6, 1994; and the stay was made conditional on the Debtors' filing an amended confirmable plan by June 24, 1994, a date by which the Debtors expected to have necessary funding in place.

FEB filed its initial Application for interim compensation and reimbursement of costs in the Pollock Cases for the period from April 3, 1993, through August 20, 1993, in the total amount of $219,678.19. Continental objected to the payment of any interim compensation to FEB from its cash collateral, as it proceeded to do in response to all applications for compensation by professionals retained by both the Debtor and the Committee, and also objected to, *inter alia,* the hourly rates charged by FEB. At hearings on Continental's Objections to the Applications of counsel for both the Debtors and for the Committee on December 22, 1993, the Committee agreed to an Order which would establish its fee, but would withhold payment until further Order of this court. FEB would not agree to such treatment. Fearing that entry of an Order similar to that entered as to the Committee's counsel would result in a wasteful appeal, as had transpired in another case involving FEB, we declined to rule on the Application. Since no payment was to be made to counsel in any event, this was a distinction from our treatment of the Committee's counsel without a real difference.

On February 17, 1994, FEB filed a second interim fee Application in the Pollock Cases, seeking compensation and reimbursement of costs totalling $118,487.70 for the period between August 21, 1993, and January 15, 1994. Objections by Continental, the Committee, and other creditors to this Application, again protesting, *inter alia,* the hourly rates re-

quested by FEB, were scheduled for a hearing on April 13, 1994.

In the meantime, in March, 1994, FEB filed a writ of mandamus seeking to compel this court to rule on its initial fee Application, which was ultimately denied. Nevertheless, after a colloquy with interested counsel on April 13, 1994, in light of the information gleaned from the lengthy hearing of April 6, 1994, which made it clear to us that the Debtors retained a clear prospect of a successful reorganization, we entered an Order of April 14, 1994, allowing all professionals employed by the Debtor and the Committee to be paid fifty (50%) percent of all interim fees allowed.

The issue of how much of the compensation allowed should be paid to professionals at that point having been resolved, we ruled on both of FEB's interim fee Applications on April 13, 1994, allowing it $191,794.89 and $109,444.38, respectively. In so ruling, we reduced the hourly rates of certain of FEB's attorneys, in a fashion similar to our actions in the Dubin Cases, as follows:

| ATTORNEY | YEAR OF LAW SCHOOL GRADUATION | RATE REQUESTED | RATES ALLOWED 1ST APP. | 2ND APP. |
|---|---|---|---|---|
| A. Fellheimer | 1971 | $325 | $250 | $260 |
| David L. Braverman | 1978 | $300 | $250 | $260 |
| J. Fellheimer | 1973 | $263 | $240 | — |
| Goodkind | 1978 | $263 | $240 | $250 |
| Kaskey | 1981 | $263 | $240 | $250 |
| L. Leonard Lundy | 1971 | $250 | $200 | — |
| Hom | 1984 | $220 | $200 | $210 |
| Meltzer | 1983 | $225 | — | $210 |

On April 25, 1994, FEB filed the Motion, requesting a hearing and reconsideration of these Orders. In support of the Motion, FEB quoted portions of *Busy Beaver, supra,* 19 F.3d at 848, 849, which had been decided on March 11, 1994, and which FEB apparently believed required this court to automatically grant it the rates which it charged clients for non-bankruptcy services, all of which it alleged were identical with those sought in the bankruptcy court in its fee Applications. This Motion was also listed for a hearing on May 25, 1994, the same date as Objections to the 2nd Application in the Dubin Cases.

At the hearings on May 25, 1994, counsel for PNC and the Committee in the Dubin Cases presented argument against FEB's thesis that *Busy Beaver* required this court to necessarily compensate FEB's professionals at their non-bankruptcy rates. They argued that *Busy Beaver* supported the principle that this court retained discretion to reduce FEB's hourly rates, which they asserted were very high relative to other local bankruptcy firms. They also pointed out that, even if the Debtors themselves had agreed to FEB's rates, their own clients had not done so. Since the Debtors were debtors-in-possession ("DIP's") acting as fiduciaries of all creditors, including their clients, they argued that they were not bound by the Debtors' agreements regarding FEB's rates.

All interested parties were accorded until June 3, 1994, to offer post-hearing submissions to the court in support of their respective positions. Only FEB offered a submission, which may not be surprising. *See Busy Beaver,* 19 F.3d at 837 n. 1 (Court of Appeals indicates that it was unable to secure services of counsel to argue in favor of a bankruptcy courts power and duty to review fee applications *sua sponte* ).

In that submission, FEB argued, first, that Meltzer's Affidavit that the bankruptcy hourly rates charged were equivalent to the firm's non-bankruptcy hourly rates should be conclusive upon this court of the hourly rates to be allowed to FEB. In the alternative, it presented a "sampling" of the rates of nineteen (19) attorneys whose rates allegedly averaged $315/hour for attorneys "with more than 20 years experience" and $230/hour for practitioners graduating from law school between 1982 and 1985. These figures, it argued, supported the conclusion that FEB's

requested rates are "well within the range" of the local market and that the $260/hour allowed by this court to A. Fellheimer was not representative of the rate charged by "senior bankruptcy practitioners" in the local market.

## C. CONCLUSION

### 1. PAST DECISIONS OF THIS COURT REGARDING ATTORNEYS' HOURLY RATES

This court addressed at some length its role in determining the hourly rates which counsel for DIP's would be allowed in fee applications in *Delaware River Stevedores*, *supra*, 147 B.R. at 870–73; and *In re Shaffer–Gordon Associates, Inc.*, 68 B.R. 344, 350–51 (Bankr.E.D.Pa.1986). Both of those decisions addressed the propriety of this court's *sua sponte* reducing the hourly rates of compensation requested by pre-eminent counsel, John Francis Gough, Esquire, and Michael T. Temin, Esquire, respectively, as we were acting in these cases without the presence of objections to their higher hourly rates requested. While expressly declining to provide for any cap on fees in those or other cases,[1] we established $200 per hour in 1986 in *Shaffer–Gordon* and, six years later in *Delaware River Stevedores*, $250 per hour as general guidelines for the highest rates we would then generally allow in the absence of a showing of the need for special skill and the exercise of such special skill in the course of representation of a DIP.

In addition to considering the fee application presented in this court, we considered, in *Delaware River Stevedores*, published data and decisions arising in other jurisdictions. 147 B.R. at 872. We noted that the average billing rate for partners and shareholder of 650 law firms nationally was $172/hour in 1991. We also cited numerous recent decisions fixing guidelines for maximum hourly rates for all bankruptcy attorneys in these courts between $100 and $175 per hour. *Id.*

We also considered the fact that much of the most important work in the *Delaware River Stevedores* case had been passed from Gough, whose requested rate was $290/hour, to Nathalie Martin, an associate whose rate was only $138/hour. We questioned whether all or most tasks in that case could not have been performed by professionals whose rates were closer to that of Martin than that of Gough. 147 B.R. at 872–73.

In both the *Shaffer–Gordon* and the *Delaware River Stevedores* decisions, we expressed awareness of the limitations of our experience in making such rulings. We urged, in both instances, that a standardization of hourly rates be established by a Fee Advisory Committee, as had been suggested by a Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 260–62 (1985). Since nothing along the line of a Fee Advisory Committee had developed as of 1992, when we drafted *Delaware River Stevedores*, we again called, in that Opinion, for establishment of guidelines "by the concerted efforts of the [United States Trustee], the bar, and the client community, as well as the bench." 147 B.R. at 870. However, nothing along the lines of such a Fee Advisory Committee has been formulated to date.

### 2. THE BUSY BEAVER DECISION

At the outset of our analysis of *Busy Beaver*, it should be said that we perceive nothing in the *Busy Beaver* decision which detracts from or criticizes the principles stated by this court in *Shaffer–Gordon* and *Delaware River Stevedores*. The *Busy Beaver* court emphatically reaffirms this court's viewpoint that it has both the power and

---

1. In a commentary on *Busy Beaver* appearing under the byline of Marvin Krasny & Kevin J. Carey, *Third Circuit Review Fees in Bankruptcy Cases*, LEGAL INTELL., March 25, 1994, at 9, 39, the authors state that

[i]t is ... clear, at least to the editors, that the bankruptcy court cannot cap attorney fees at any fixed hourly rate in view of the 3rd Circuit [sic] clearly stating that an applicant needs to know the basis on which the court disallows

the fee and be given an opportunity to present evidence that the law firm makes similar charges to non-bankruptcy clients.

It is not clear to this court where the authors obtain this principle from *Busy Beaver*, as that topic is not addressed therein. Perhaps this article generated the argument made by FEB that this court must award it the hourly rate that it allegedly charges non-bankruptcy clients. In any event, at least this court has never had a cap on rates. *See also* page 124 n. 3 *infra*.

duty to review fee applications *sua sponte.* 19 F.3d at 840–45. We submit that it would be fundamentally inconsistent with the principle that bankruptcy courts have this power and duty to effect a plenary review of fee application on their own to conclude, as FEB apparently argued, that this review, as to the hourly rates sought by counsel, is foreclosed by a firm's apparently rather ordinary practice of quoting bankruptcy clients the same rates as other clients. Moreover, here, in contrast to the circumstances at issue in *Shaffer–Gordon* and *Delaware River Stevedores,* several creditors have actively objected to the rates charged by FEB to respective DIP's.

FEB's quotation of excerpts from the *Busy Beaver* decision stating that the billing practices of a firm in bankruptcy cases are to be considered on the same basis as they would in non-bankruptcy related services is of course accurate, but it is taken out of its context in that Opinion. In the passages quoted by FEB, the *Busy Beaver* court is addressing the bankruptcy court's categorization, in that case, of certain services as "clerical," not the fixing of hourly rates. 19 F.3d at 848–51. Clearly, the billing of non-attorney services as "clerical" is not an issue raised by FEB. To the extent that such an issue is relevant here, we note that FEB utilizes paralegals to a very limited extent, which is likely to inflate the time expended by its attorneys. Moreover, the *Busy Beaver* Opinion could hardly be read as holding that a firm which charges excessive rates outside of bankruptcy can carry this practice over to claims from estates in bankruptcy cases. *See Daggett v. Kimmelman,* 811 F.2d 793, 799 (3d Cir.1987) ("there . . . comes a point where a lawyer's historic rate, which private clients are willing to pay, cannot be imposed on his or her adversaries.").

Moreover, in assessing the issue of whether the particular services at issue in that case were in fact "clerical," the *Busy Beaver* court suggests a multi-step process which it de-

scribes holistically as "the market approach." *Id.* at 851–56. In applying this "market approach," the bankruptcy court is urged, "[l]ike any sophisticated consumer of legal services, [to] compare the costs of 'equivalent' practitioners of the art (including their billing structures) as well as the applicant's billing practices with 'equivalent' clients." *Id.* at 853. With respect to verification of market rates, the court observes, *id.* at 854, that

> certainly a bankruptcy judge's experience with fee petitions and his or her expert judgment pertaining to appropriate billing practices, founded on an understanding of the legal profession, will be the *starting point* for any analysis.[31]

[31.] *See, e.g., In re Patronek,* 121 B.R. 728, 730–31 (Bankr.E.D.Pa.1990); . . .

While the bankruptcy court is urged to consider relevant, competent evidence submitted with the application or at a hearing, it is directed to consider its own judgments in light of that evidence, *id.* at 854, not to substitute that evidence of its own best judgment. Bankruptcy courts are also cautioned to see that bankruptcy fee applicants do not receive higher compensation in bankruptcy courts than elsewhere because of the applicant's failure to see fit to exercise the "billing judgment" which it would be likely to employ in charging non-bankruptcy clients. *Id.* at 855–56. Finally, the court criticizes that reasoning of *In re Boddy,* 950 F.2d 334, 337 (6th Cir.1991), which suggests that the "lodestar method" is the exclusive means of evaluating bankruptcy fee applications. *Id.* at 856.[2]

### 3. *APPLICATION OF BUSY BEAVER TO THE MATTERS AT ISSUE*

a. *FEB'S NON–BANKRUPTCY RATES CANNOT BIND THIS COURT IN DETERMINING ITS PROPER BANKRUPTCY RATES*

■ Contrary to FEB's initial argument, we conclude that it would be totally mislead-

---

**2.** In so stating, and by its citation of *Patronek, supra,* with obvious approval, *see id.* at 854 n. 21 and page 14 *supra,* the *Busy Beaver* court appears to approve this court's approach to fee applications in consumer cases as is set forth in *Patronek,* in response to attacks upon it which appear in such cases as *In re Paul,* 141 B.R. 299, 301–02 (E.D.Pa.1992). In *Patronek,* we noted

that the lodestar is, at bottom, a means of attempting to put a market rate on particular legal services in a lawsuit, and that a lodestar analysis is unnecessary and may in fact be misleading when a real market rate for certain routinized services exists and can be used directly as a means of measurement of the market rate. 121 B.R. at 731–32.

ing, improper, and inconsistent with *Busy Beaver* to conclude that this court is obliged to award to FEB, in its fee applications, the same hourly rates which it requests from non-bankruptcy clients without further question. First of all, as PNC and the Pollock Cases Committee argued, a DIP is a fiduciary which acts for all of its creditors. Those creditors cannot be bound by an agreement between the debtor and its counsel, but must always have the right to question all financial aspects of that relationship, including the hourly rates charged by the DIP's chosen counsel. Unless full payment to all creditors occurs, which is an unlikely scenario in either the Dubin Cases or the Pollock Cases, FEB will be paid its fees out of sums which otherwise could be paid to creditors.

■ Furthermore, even when no creditors object, *Busy Beaver* reaffirms the duty of this court to review all aspects of the fee arrangement between the debtor and its counsel. In this way, the integrity of the bankruptcy process is upheld and even small creditors lacking the resources to mount objections to fee applications can be assured some measure of oversight of fees awarded by the bankruptcy court. This principle would appear to apply equally to hourly rates requested as well as to whether particular entries on a fee application support a request for compensation.

■ We believe that *Busy Beaver* requires that we apply the multi-step "market approach," set forth therein at 19 F.2d at 851–56 and page 121 *supra*, in ruling on the 2nd Application and the Motion before us. The starting point of this approach is describing our own experience with fee applications which are filed before us. In ruling on the appropriate market rate of professionals in such applications, we consider, basically, three factors: (1) What does the professional person request? (2) What level of expertise or experience was required to perform the tasks in issue and how well have they been performed? and (3) What have other professionals of similar experience and expertise, faced with similar problems and performing with a level of competence comparable to the applicants in issue, typically charged?

b. *THIS COURT'S EXPERIENCE JUSTIFIES THE RATES ALLOWED*

■ With respect to an applicant's request for certain hourly rates, we begin from the fairly obvious observation that this court will rarely, if ever, grant an applicant a higher rate than is requested. It therefore behooves a professional to declare the highest possible hourly rate in a fee application. The only consequence of an excessive request, except for a loss of credibility with the court, is a reduction of that rate to a rate that reasonably should have been requested in the first place. Moreover, in all but a very small percentage of instances, this court makes little or no reduction to the hourly rates requested.

This state of affairs creates a potential for an unreasonable upward escalation in hourly rates. We must confess that even our own escalation in the general maximum rate guideline from $200 in *Shaffer–Gordon* to $250 in *Delaware River Stevedores* for lawyers of basically the same high experience level over a mere seven-year period is troubling. Inflation has not generally been at the twenty-five (25%) percent level over those years, as was the increase from $200 to $250. Perhaps only a Fee Advisory Committee, which can speak for a cross-section of interests, can allay our concern that, if unchecked and left strictly to their own declarations as a maxim, professionals will inevitably escalate, with some degree of rapidity, the standard hourly rates payable to them.

Assessment of the level of difficulty of the tasks presented in representing the DIP's in the Dubin Cases and the Pollock Cases and the level of skill displayed in fulfillment of those tasks by FEB is difficult to measure. These cases are both moving very slowing towards confirmation, if at all. The DIPs' necessity to reach some accord with their secured creditors has been only partially realized, despite the considerable age of both cases, particularly in the Pollock Cases. It is difficult to place all of the blame on FEB for these circumstances. However, we must observe that we have found the culture of the FEB firm to be, at times, overly contentious.

We are usually reluctant to make a definitive qualitative judgment of services performed by a DIP's counsel, however, and we will not do so here except to state that FEB's performance has been near the mid-point between the worst and the best.

We do note that the problems presented in the Pollock Cases, which have appeared to be more difficult than those presented by the Dubin Cases, have not prompted FEB to put its most experienced practitioners in charge of those Cases. Junior partner Hom and, after her maternity leave, junior partner Meltzer have been placed in charge of those Cases. It is difficult to justify allowing A. Fellheimer to bill at his higher rate for his services which did not require as high a degree of skill as those competently performed by Hom and Meltzer, *e.g.*, conducting the actual trials and drafting the major legal documents.

We find that the instant Cases, particularly the Pollock Cases, have been relatively difficult. The results achieved in both Cases are questionable. While Hom and Meltzer in the Pollack Cases and Kaskey in the Dubin Cases have performed adequately, they have not performed spectacularly. The services of FEB professionals with the highest rates have not been shown to have been particularly necessary, nor superior to those of lead counsel. In sum, the performance of FEB in these Cases has been of average competence. We further perceive no reason why professionals of the level of Hom and Meltzer, who charge at $220 and $225 an hour, could not have performed *all* of the services in these cases. Therefore, justification would appear to exist to cut the rates of all FEB's professionals to both Cases to their levels.

With respect to the third issue, *i.e.*, comparison of FEB's rates with those of other firms to perform comparable services, it was our distinct impression that FEB's hourly rates exceeded the norms of the local marketplace for comparable services. FEB is a new firm. Many of its partners come from other firms. In almost every instance, *e.g.*, those of Hom, Kaskey, Meltzer, Braverman, arrival at FEB resulted in an immediate significant ($20 to $40/hour) increase in that attorney's hourly rate. These increments were difficult to justify. Turnover of partners and associates at FEB during its brief tenure has been high. In sum, little about the firm to date has suggest a justification for its charging the top-dollar rates requested.

In light of the foregoing considerations, this court concludes that the hourly rates allowed in the awards in the *Pollock* Cases were, on the whole, quite generous to FEB.

c. *THE EVIDENCE PRESENTED BY FEB IN OPPOSITION TO THIS COURT'S RULINGS IS INCONCLUSIVE*

The *Busy Beaver* "market approach" next requires that the evidence presented by FEB in support of its claims for higher rates must be assessed. The only evidence presented, apart from the Meltzer Affidavit supporting the principle that FEB charges the same rates to non-bankruptcy clients, which we would rather assume to be the case and which we do not find advances FEB's position as a matter of law, is the "sampling" of hourly rates of nineteen (19) attorneys practicing bankruptcy law in other firms. On the whole, we find this "sampling" to be an episodic and unreliable survey which is of little evidentiary value. Seven (7) of the nineteen (19) practitioners are listed as having "more than 20 years experience," which FEB suggests is the equivalent of the experience of A. Fellheimer. We note, however, that A. Fellheimer graduated from law school in 1971, and thus has 23 years experience as an attorney. Much of this 23–year period, according to his biography included in the fee application, was spent in service as a bank officer in Pittsburgh. The precise nature of his purported "national reputation" is not completely clear. By way of comparison, the seven (7) practitioners named, Marvin Krasny, David Sykes, Michael Bloom, Howard Glassman, Charles Golden, Neal Colton, and Albert Ciardi, Jr., have been Philadelphia bankruptcy lawyers of impeccable reputation, many for far more than 20 years. A. Fellheimer's experience as a bankruptcy lawyer is significantly less than many of these attorneys. We also note that he cannot match the longevity of Gough (admitted to practice in 1961) and Temin (admitted to practice in

1957), the attorneys at issue in *Delaware River Stevedores* and *Shaffer–Gordon*, respectively.

No 1973 law graduates like J. Fellheimer are named in the "sampling." One 1978 graduate (comparable to Braverman and Goodkind), Lawrence Tabas, at $285/hour, is named. No 1981 graduates (as is Kaskey) are named. Two 1983 graduates (as is Meltzer), both at $225/hour, Andrew Kassner and J. Scott Victor, are referenced. One 1984 graduate (comparable to Hom), Joel Shapiro, at $205/hour, is named.

d. *OUR OWN MORE COMPREHENSIVE EVIDENCE AND OTHER RELEVANT FACTORS, SUCH AS REVIEW OF FEB'S APPARENT LACK OF "BILLING JUDGMENT," SUPPORT THIS COURT'S REDUCTIONS IN THE HOURLY RATES OF SOME OF FEB'S ATTORNEYS*

In response to this evidence presented in the FEB's "sampling," we have logged all or most fee applications filed before this judge and ruled upon in 1994. We consider the actual requests by counsel in applications brought before this court to be more significant than the rates quoted by FEB, which were double hearsay and could have represented a "wish list" rather than actual requested rates. Although the services performed in the applications surveyed mostly occurred in 1993, so did FEB's services performed in the Pollock Cases and the Dubin Cases which are the subject of the fee applications before us. If we went further back, the results would be more complete and comprehensive, but they might suffer from being more out of date. In so doing, we obtained much more data than FEB included in its "sampling" and we believe that the results provide a better frame of reference. The data obtained from these logs yields the following results:

1. 1969–71 law graduates (A. Fellheimer—requesting $325/hour):

| | |
|---|---|
| Robert Levin | $280 [3] |
| Allen Dubroff (1969) | 240 |
| James Adelman (1970) | 200 |
| Neal Colton (1970) | 310 [3] |
| Alan Gordon (1970) | 290 [3] |
| John Jenkins (1969) | 185 |
| James Penny | 275 [3] |
| Average: $254.5/hour | |

2. 1973 law graduates (J. Fellheimer—requesting $263/hour):

| | |
|---|---|
| Steven Usdin | $220 |
| Kenneth Aaron | 245 |
| Jeffrey Garson | 245 |
| Average: $237/hour | |

3. 1978 law graduates (Braverman and Goodkind, requesting $300/hour and $268/hour, respectively):

| | |
|---|---|
| Edward DiDonato | $235 |
| Joan Dorgan | 190 |
| Lawrence McMichael | 275 [4] |
| Average: $233/hour | |

4. 1981 law graduates (Kaskey—requesting $263/hour):

| | |
|---|---|
| Gary Bressler | $220 |
| John Carroll | 200 |
| Leslie Baskin | 165 |
| Eric Stern | 225 |
| Average: $200/hour | |

5. 1983 law graduates (Meltzer—requesting $225/hour):

| | |
|---|---|
| Robert Bovarnick | $195 |
| Ethan Fogel | 195 |
| Scott Victor | 225 |
| John Ryan | 195 |
| Abbi Cohen | 195 |
| Average: $201/hour | |

6. 1984 law graduates (Hom—requesting $220/hour):

| | |
|---|---|
| Raymond Lemisch | $200 |
| Paul Maschmeyer | 195 |
| Paul Gagne | 205 |
| Jonathan Drake | 195 |
| Stephanie Resnick | 195 |
| Gregory Kreiber | 190 |
| Average: $197/hour | |

In light of these figures, we conclude that no upward adjustments from the amounts awarded to FEB in the *Pollock* Cases fee applications would be appropriate. The $250–260 range is appropriate for A. Fellheimer, not the $325/hour which he seeks. The rate of $240/hour allowed by us to J.

---

**3.** This court, considering the nature of the tasks performed by each of these attorneys in the particular cases in question, reduced Levin's and Colton's rates to $275/hour, Gordon's rate to $260/hour, and Penny's rate to $250/hour. This court's action exemplifies that we have not established a cap rate of $250/hour, although we have exercised some controls on the higher requests.

**4.** McMichael's hourly rate was reduced to $250/hour.

Fellheimer was, if anything, above the norm. The hourly rates allowed to Braverman, Goodkind, and Kaskey by this court were also consistently well above the norm. The $210/hour rates allowed by this court to Meltzer and Hom also exceed the above averages for attorneys of comparable experience.

In light of the fact that we would rate FEB's overall performance in these cases as average, no justification for allowance of rates far above or even any degree above the averages appears justified. We would in fact be compelled to observe that this court could more readily be chargeable with allowing excessive rates to FEB, which are higher than would be allowable to comparable professionals in a non-bankruptcy context, than with setting its rates of compensation too low. In this respect, we note little evidence of the exercise of "billing judgment" by FEB. Charges are made for all services, even those performed in matters which were unsuccessful. Paralegals are used sparingly despite the presence of many tasks which could have been assigned to them. Little effort to assign matters to the professionals charging the lowest rates who are capable of performing those duties is exhibited, *e.g.*, the more experienced Kaskey has been assigned the less difficult Dubin Cases, while the less experienced Hom and Meltzer are assigned the Pollock Cases, which have been far more contentious and complex from their beginnings. It is difficult to see why Hom, Meltzer, or Kaskey could not have performed most or all of the services undertaken by A. Fellheimer at his higher rate.

We also believe that a degree of caution must be employed in utilizing the comparable fee data because of a bias favoring the applicants. The figures which we utilized in formulating the averages were those requested by the attorneys themselves. No outside checks from the other constituencies that would be expected to be a part of a Fee Advisory Committee were included. For the reasons stated at pages 122–23 *supra*, it ap-

pears to us that this method of data collection will produce the highest possible average hourly rates. That FEB's rates are consistently above those averages does not means that its rates are merely above average. Rather, it means that its rates are above even those rates to which the average practitioners aspire.

In light of the foregoing, we conclude that the hourly rates assigned to FEB's attorneys in deciding the fee applications in the Pollock Cases were appropriate. The motion to reconsider those Orders will therefore be denied.

■ PNC's Objections to the 2nd Application submitted in the Dubin Cases will be sustained as to its claims that FEB's hourly rates are excessive. In calculating the compensation due under same, the hourly rate of A. Fellheimer will be reduced to $260/hour; the rates of Kaskey and Goodkind will be reduced to $240/hour; and the rate of Hom will be allowed at $210/hour.[5]

*D. CONCLUSION*

An Order consistent with the foregoing conclusions will be entered.

*ORDER*

AND NOW, this 23rd day of June, 1994, after a hearing and argument on the Motion of FELLHEIMER EICHEN & BRAVERMAN, P.C. ("FEB") for Hearing and Reconsideration of Interim Fee Award Orders in Bankruptcy No. 93–11975DAS ("the Motion"), and the Objections of PNC BANK ("the Objection") to the Second Application of FEB for Interim Compensation in Bankruptcy No. 93–11368DAS ("the Application"), and upon consideration of FEB's post-hearing submission, it is hereby ORDERED as follows:

1. The Motion is DENIED.

2. The Objection to the Application is SUSTAINED in part.

3. FEB is hereby allowed the sum of $57,557.00 as interim compensation as coun-

---

**5.** It should also not be forgotten that all of the fee applications in issue concern merely advances of interim compensation, pursuant to 11 U.S.C. § 331. As such, they are interlocutory orders, subject to adjustment at the end of a case and are therefore not appealable. *See Boddy, supra*, 950

F.2d at 336; *In re Hillsborough Holdings Corp.*, 164 B.R. 673 (M.D.Fla.1994); *In re Valley Forge Plaza Associates*, 119 B.R. 471 (E.D.Pa.1990); and *In re St. Joseph's Hospital*, 102 B.R. 416, 421 (Bankr.E.D.Pa.1989).

sel for the Dubin Debtors-in-Possession for the period from June 21, 1993, through and including March 11, 1994, and is further allowed the sum of $6,371.91 for reimbursement of costs expended during the same period of time.